**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 19-14086-ROSENBERG/MAYNARD**

**UNITED STATES OF AMERICA**
**& STATE OF FLORIDA**
*ex rel.* **HEIDI GRAVES,**

       **Plaintiffs,**

**v.**

**C/HCA, INC., d/b/a Highlands Regional**
**Wound Healing and Hyperbaric Center;**
**SEBRING HEALTH SERVICES, LLC**
**d/b/a HCA Florida Highlands Hospital;**
**HEALOGICS, INC.; NAUTILUS**
**HEALTHCARE GROUP, LLC;**
**and DR. ROGER ARUMUGAM,**

       **Defendants.**

_____/

**REPORT AND RECOMMENDATION ON DEFENDANTS'**
**MOTION TO DISMISS AMENDED COMPLAINT [DE 86]**

In March 2019, Heidi Graves filed this *qui tam* case under seal on behalf of herself, the

United States of America, and the State of Florida for alleged violations of the False Claims

Act ("FCA"), 31 U.S.C. § 3729 *et seq.* and the Florida False Claims Act ("F/FCA"), Fla. Stat.

§ 68.082 *et. seq.*[1] DE 1.  The case centers on allegations that Defendants submitted false claims

to Medicare and Medicaid through an "upcoding" billing scheme related to wound care services

provided by one doctor.  The case remained under seal pending government investigation.  Four

years later, in April 2023, the United States and Florida declined to intervene.  DE 49.

_____

[1] The FCA and the F/FCA allow private persons, known as relators, to bring civil actions—known as *qui tam* lawsuits—for alleged fraud against the United States and the State of Florida, respectively. 31 U.S.C. § 3730(b); Fla. Stat. § 68.083(2).

The complaint was thereafter unsealed and Defendants Roger Arumugam, M.D. ("Dr. Arumugam"), C/HCA, Inc. d/b/a Highlands Regional Wound Healing and Hyperbaric Center ("HCA"), and Healogics, Inc. ("Healogics") (collectively, "Original Defendants") were served in July 2023.  DE 50, DE 56, DE 58, DE 59.  Following Relator's authorized filing of an Amended Complaint in September 2023, DE 83, the Original Defendants moved to dismiss it in its entirety, DE 86.

The Amended Complaint adds two new Defendants—Sebring Health Services, LLC ("Sebring") and Nautilus Health Care Group, LLC ("Nautilus") (collectively, "New Defendants").  The New Defendants were served on October 13, 2023.  DE 96; DE 97.  On November 3, 2023, after the Original Defendants' Motion to Dismiss was fully briefed, the New Defendants made their first appearance and filed an unopposed motion to adopt the Motion to Dismiss "[t]o avoid duplication, and for purposes of judicial economy and efficiency" and because the Motion to Dismiss "properly accounts for Sebring and Nautilus' legal arguments." DE 99.  This unopposed motion to adopt was granted.  DE 102.  Thus, in this report, the three Original Defendants and the two New Defendants will be collectively referred to as "Defendants."

Defendants' Motion to Dismiss is referred to me for appropriate disposition.  DE 88. For the following reasons, I respectfully recommend that the Motion to Dismiss be **GRANTED IN PART AND DENIED IN PART**.  More specifically, my recommendation is that the Motion to Dismiss be granted only insofar as the Amended Complaint should be dismissed, however Defendants' request for dismissal with prejudice should be denied and Plaintiff should be afforded one final opportunity to amend her claims.

## BACKGROUND[2]

### A.     The Parties

Highlands Regional Medical Center Wound Healing and Hyperbaric Center (the "Center") is located in Sebring, Florida.  DE 83 ¶ 8.  Tennessee-based Defendant HCA acquired this Center from a predecessor company in 2017 and operated it in partnership with Florida-based Defendant Healogics.  *Id.* ¶¶ 8, 10, 29.  Defendant Healogics is alleged to provide wound healing services at over 800 wound care centers nationwide.  *Id.* ¶ 10.  Sebring is an alleged subsidiary of HCA and Nautilus is an alleged subsidiary of Healogics.  DE 83 ¶¶ 9, 11.

On September 15, 2016, Ms. Graves was hired to be a Clinical Nurse Manager at the Center and she worked there for nearly two years—through July 16, 2018.  *Id.* ¶¶ 2, 28, 59.  When hired, Ms. Graves had 15 years of prior work experience in wound care and hyperbaric medicine.  *Id.* ¶ 28.  Throughout Ms. Graves' employment, Defendant Dr. Arumugam was the Center's Medical Director.  *Id.* ¶¶ 12, 29-30.

### B.     The Amended Complaint's Allegations

The Amended Complaint centers on wound care debridement, described as a common treatment involving "the removal of devitalized and/or necrotic tissue to promote healing of a wound on the skin."  *Id.* ¶ 23.  If medically necessary, this treatment is reimbursable by Medicare and Medicaid and reimbursement amounts differ depending on the size and complexity of the debridement.  *Id.* ¶¶ 23-24.  The Amended Complaint differentiates between *selective* debridement, described as involving the removal of specific, targeted areas of nonviable tissue, and the minimal use of anesthesia, and more complicated *surgical*

---

[2] These background facts draw from the Amended Complaint.  At this motion-to-dismiss stage, as I must, I accept as true Ms. Grave's factual allegations and construe them in the light most favorable to her.

debridement, described as involving the removal of nonviable tissue (like selective debridement) plus the removal of subcutaneous tissue, muscle, and/or bone. *Id.* ¶¶ 25-26.

Medical providers performing selective debridement bill under CPT Codes 97597 and 97598. *Id.* ¶ 25. According to Medicare billing and coding wound care guidelines, providers should typically bill CPT Codes 97597 and 97598 for recurrent wound debridements. *Id.* Meanwhile, the CPT Code a provider should use for surgical debridement depends on the extent of the tissue removed. *Id.* ¶ 26. Surgical debridement of subcutaneous tissue is billed using CPT Code 11042, surgical debridement including the removal of subcutaneous tissue *and muscle* is billed under CPT Code 11043, and surgical debridement including the removal of subcutaneous tissue, muscle, *and bone* is billed under CPT Code 11044. *Id.*

Ms. Graves worked directly with various doctors at the Center, including Dr. Arumugam. *Id.* ¶ 31. Frequently throughout Ms. Graves' employment, Dr. Arumugam performed selective debridement—the removal of specific, targeted areas of nonviable tissue—on patients. *Id.* ¶ 32. Ms. Graves participated in these procedures, and the debridement for these patients would not involve any removal of subcutaneous tissue. *Id.* While Dr. Arumugam should have billed the procedures using CPT Code 97597 for selective debridement, he would instead "falsely record the procedure in the medical records used to prepare claims as a surgical debridement of subcutaneous tissue or muscle and would bill using CPT Code 11042." *Id.* ¶ 33. "By falsely 'upcoding' the debridement procedures that he performed from 97597 to 11042 on the patient charts used by HCA and Healogics to prepare Medicare and Medicaid claims, Dr. Arumugam significantly increased the Medicare and Medicaid reimbursement amounts paid to HCA and Healogics." *Id.* ¶ 34.

Ms. Graves asserts that Dr. Arumugam routinely upcoded his selective debridement charges to surgical, "resulting in as many as 15 surgical debridement claims to Medicare or Medicaid for a single patient over just a few months." *Id.* ¶ 34.  The Amended Complaint provides charts with billing information for four anonymous patients seen by Dr. Arumugam at the Center for appointments in 2017 and early 2018, and includes, for each representative patient, dates of service, dates of claim, CPT Codes, and amounts billed and paid.  *Id.* ¶¶ 36-54.  According to Ms. Graves, it was not reasonable or medically necessary to perform so many surgical debridement procedures per patient and Ms. Graves alleges a specific date as to each patient after which false claims "resulted from Dr. Arumugam's upcoding of selective debridement (CPT code 97597) to surgical debridement (CPT code 11042)."  *Id.* ¶¶ 38-39, 43-44, 48-49, 53-54.  According to Ms. Graves, because of this upcoding, HCA and Healogics submitted Medicare claims that did not reflect the service provided and sought higher reimbursement than what Medicare would have paid had it known that the CPT code billed did not match the service provided.  *Id.* ¶¶ 40, 45, 50, 55.

In addition to the anonymous patient information, Ms. Graves alleges that Medicare claim submission information for Dr. Arumugam also establishes his fraudulent billing practices.  *Id.* ¶ 56.  For example, according to claims data for the year 2017, Dr. Arumugam submitted 449 claims to Medicare for debridements that year.  *Id.* ¶ 57.  Of these 449 claims, every claim applied a surgical debridement code (11042) and there were no claims for the less expensive selective debridement (97597) even though Ms. Graves claims to have witnessed Dr. Arumugam perform the latter service far more often in 2017.  *Id.*

Ms. Graves confronted Dr. Arumugam several times and stated that a debridement procedure that he provided should be billed at a selective debridement CPT code rather than as

a more expensive surgical debridement.  *Id.* ¶ 58.  In response, Dr. Arumugam belittled Ms. Graves and dismissed her concerns.  *Id.*  In May 2018, Ms. Graves reported the upcoding issue to HCA's Chief Nursing Officer, Ms. Marsha Jamison.  *Id.*  On July 13, 2018, when Ms. Graves says she could no longer work in the environment after HCA ignored her fraudulent billing concerns, she gave HCA a 30-day notice of her intent to resign.  *Id.* ¶ 59.  On July 16, 2018, HCA terminated Ms. Graves' employment and told her she could not work during the notice period.  *Id.*  Ms. Graves asserts her termination was in retaliation for her raising her false claim concerns.  *Id.*

In her Amended Complaint, Ms. Graves asserts nine counts.  Counts 1, 2 and 3 allege that each Defendant violated 31 U.S.C. §3729(a)(1)(A) of the FCA, which imposes liability on anyone who "knowingly" presents a "false" claim to the Government. Count 4 alleges that Defendant Dr. Arumugam violated 31 U.S.C. § 3729(a)(1)(B) of the FCA, which imposes liability on anyone who "knowingly" makes or uses "a false record or statement material to a false or fraudulent claim." Counts 5, 6 and 7 allege that each Defendant violated Fla. Stat. § 68.083(2)(a) of the F/FCA.  Count 8 alleges that Defendant Dr. Arumugam violated Fla. Stat. § 68.083(2)(b) of the F/FCA.[3] Count 9 alleges that Defendant HCA violated the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h).

---

[3] Counts 5-8 are the state counterparts to Counts 1-4 and the same standards apply to each set.  *See U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007) ("[T]he standards under both the Florida Act and the Federal Act are the same"); *U.S. Space Coast Medical Assocs.*, 94 F. Supp. 3d 1250, 1252 n.4 (M.D. Fla. 2015) ("The Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard").

C.      **Motion to Dismiss**

Defendants seek to dismiss the entire Amended Complaint for (1) failure to plead falsity, (2) failure to satisfy Rule 8's basic pleading demands, much less Rule 9's heightened standard for fraud-based claims, (3) failure to allege the actual submission of a false claim, (4) failure to plead scienter or causation, (5) failure to state a valid "false record" claim against Dr. Arumugam, (6) failure to state any claims under the F/FCA, (7) failure to plead cognizable retaliation, and (7) failure to establish standing to sue on behalf of the United States or Florida. DE 86 at 9. The issues are fully briefed. DE 92; DE 94. Thus, the Motion to Dismiss is ripe for review.

## STANDARD OF REVIEW

When considering a motion to dismiss, the complaint's allegations must be accepted as true with all reasonable inferences that can be drawn from them construed in the relator's favor. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1050 (11th Cir. 2015).

A complaint alleging FCA violations must satisfy two requirements. First, the complaint must comply with Federal Rule of Civil Procedure 8, which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). To avoid dismissal, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible on its face when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678.

Second, the complaint must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading requirement for fraud claims. *U.S. ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d

1301, 1308-09 (11th Cir. 2002) (holding Rule 9(b) applies in FCA cases).  "The particularity rule serves an important purpose in fraud actions by alerting defendants to the precise misconduct with which they are charged and protecting defendants against spurious charges of immoral and fraudulent behavior."  *U.S. ex rel. Mastej v. Health Mgmt. Assocs., Inc.*, 591 F. App'x 693, 703 (11th Cir. 2014) (quoting *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006)).

To meet this heightened pleading requirement in a *qui tam* action, "a relator must allege the actual submission of a false claim because the False Claims Act does not create liability merely for a health care provider's disregard of government regulations or improper internal policies unless the provider asks the government to pay amounts it does not owe." *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018).

Because submitting an actual claim to the government for payment is "the *sine qua non*" of a FCA violation, *Clausen*, 290 F.3d at 1311, a relator must "plead the submission of a false claim with particularity," by identifying "the particular document and statement alleged to be false, who made or used it, when the statement was made, how the statement was false, and what the defendants obtained as a result." *Mastej*, 591 F. App'x at 703-04 (citing *U.S. ex rel. Matheny v. Medco Health Solutions Inc.*, 671 F.3d 1217, 1225 (11th Cir. 2012).

## ANALYSIS

As a threshold matter, I will briefly address Defendants' standing argument.  To the extent Defendants contend that Ms. Graves lacks standing to sue in the name of the United States or Florida, I disagree.  *Qui tam* is short for *qui tam pro domino rege quam pro seipso*, meaning "he who as much for the king as for himself." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008) (quotation and citation omitted).

In a *qui tam* action, a private person, known as the relator, sues as "a partial assignee of the United States" and pursues the government's claim against a defendant by asserting the injury suffered by the government, which confers standing on the relator to sue. *Id.* (citing *Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765, 774 n.4 (2000)). *Qui tam* actions are creatures of statute, with the FCA being one of the best known. *Id.* (citation omitted).

As discussed above, the FCA permits a person like Ms. Graves to bring a civil action on behalf of herself and the government. 31 U.S.C. § 3730(b)(1). The FCA vests the government with substantial authority and control over the action, including the rights to dismiss the action without the relator's consent, to review the complaint under seal prior to service, and the right to veto or approve a settlement. *See* 31 U.S.C. § 3730(b)-(c). The FCA also provides ways to apportion the proceeds of the action between the relator and the government, depending on the nature of the action. 31 U.S.C. § 3730(d). Here, Ms. Graves invokes the FCA and asserts *qui tam* claims against Defendants stemming from their alleged submission of false claims for government payout. With standing established, I now turn to the counts in the Amended Complaint and the parties' arguments for and against dismissal.

### A.    Counts 1-4:  FCA Claims Against All Defendants

Counts 1, 2 and 3 allege that each Defendant violated 31 U.S.C. § 3729(a)(1)(A) of the FCA, whereas Count 4 alleges that Defendant Dr. Arumugam violated 31 U.S.C. § 3729(a)(1)(B) of the FCA.

In relevant part, the cited statutory provisions of the FCA permit private individuals to file *qui tam* actions on behalf of the United States against any person who:

> (A)    knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B)     knowingly makes, uses, or causes to be made or used, a false record or
        statement material to a false or fraudulent claim; . . .

31 U.S.C. § 3729(a)(1)(A)-(B); *U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148,

1154 (11th Cir. 2017).  The FCA defines "knowingly" as involving a person who "(1) has actual

knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the

information; or (3) acts in reckless disregard of the truth or falsity of the information."  31

U.S.C. § 3729(b).  In short, either actual knowledge, deliberate ignorance, or recklessness will

suffice.  No proof of specific intent is required.  *Id.*  The FCA defines a "claim" as "any request

or demand, whether under a contract or otherwise, for money or property which is made to a

contractor, grantee, or other recipient if the United States Government provides any portion of

the money or property which is requested or demanded." 31 U.S.C. § 3729(c).  The FCA

provides for penalties of $5,000-$10,000 per claim and treble damages.  *Clausen*, 290 F.3d at

1307-08 (citing 31 U.S.C. § 3729(a)).  And if the government declines to intervene, as here, the

plaintiff-relator can receive 25-30% of any recovery and reasonable expenses and attorneys'

fees.  *Id.* at 1308 (citing 31 U.S.C. § 3730(d)).

       To state a valid presentment claim under § 3729(a)(1)(A), the Eleventh Circuit has held

that "a relator must allege the actual submission of a false claim" and "offer some indicia of

reliability . . . to support the allegation of an actual false claim for payment being made to the

government."  *Carrel v. AIDS Healthcare Found., Inc.*, 898 F.3d 1267, 1275 (11th Cir. 2018);

*see also U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 747 (2023) (two essential elements

of a FCA violation are (1) the falsity of the claim and (2) the defendant's knowledge of the

claim's falsity).  To state a valid false record claim under § 3729(a)(1)(B), a relator must allege

that (1) the defendant made (or caused to be made) a false statement, (2) the defendant knew it

to be false, and (3) the statement was material to a false claim. *U.S. ex rel. Crocano v. Trividia Health Inc.*, 615 F. Supp. 3d 1296, 1303-04 (S.D. Fla. 2022).

Notably, a relator may not "describe a private scheme in detail but then . . . allege simply and without any stated reason for [the relator's] belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government." *Clausen*, 290 F.3d at 1311. Instead, "some indicia of reliability must be given in the complaint to support the allegation of an actual false claim for payment being made to the Government." *Id.*

In the seminal case of *Clausen*, the Eleventh Circuit explained the centrality of false claim submission to a FCA claim as follows:

> The False Claims Act does not create liability merely for a health care provider's disregard of Government regulations or improper internal policies unless, as a result of such acts, the provider knowingly asks the Government to pay amounts it does not owe . . . Without the *presentment* of such a claim, while the practices of an entity that provides services to the Government may be unwise or improper, there is simply no actionable damage to the public fisc as required under the False Claims Act . . . The submission of a claim is thus not, as Clausen argued, a "ministerial act," but the *sine qua non* of a False Claims Act violation.

*Clausen*, 290 F.3d at 1311 (emphasis in original) (citations omitted). On appeal, the Eleventh Circuit affirmed the district court's dismissal of a relator's second amended complaint alleging fraudulent billing practices for failure to assert specific information about the actual submission of false claims to the government. *Id.* at 1302, 1311-12. The Eleventh Circuit noted that the operative complaint's allegations did not identify amounts charged, allege actual dates, describe policies about billing or second-hand information about billing practices, or provide a single bill or proof of payment. *Id.* at 1312. Indeed, "nowhere in the blur of facts and documents

11

assembled by Clausen regarding six alleged testing schemes can one find any allegation, stated with particularity, of a false claim actually being submitted to the Government." *Id.*

Then, in *Mastej*, the Eleventh Circuit offered an alternative path to establishing the required indicia of reliability that a false claim was submitted. *Mastej*, 591 F. App'x at 707-09. There, the relator held executive positions with the defendant corporations operating hospitals, through which he gained direct information about Medicare and Medicaid billings, and he attended meetings during which Medicare patients and bills were discussed. *Id.* at 695-96, 707-08. Noting the "nuanced, case-by-case approach" to determining reliability in this context, the Eleventh Circuit held that "a relator with direct, first-hand knowledge of the defendants' submission of false claims gained through her employment with the defendants may have a sufficient basis for asserting that the defendants actually submitted false claims" while a relator without such first-hand knowledge "is unlikely to have a sufficient basis for such an allegation." *Id.* at 704. At minimum, the relator "must explain the basis for her assertion that fraudulent claims were actually submitted." *Id.* (citing *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013–14 (11th Cir. 2005) (finding insufficient indicia of reliability where the relator "did not explain why he believes fraudulent claims were ultimately submitted").

Ultimately, in *Mastej*, because the relator was "actively and heavily engaged in the Defendants' business and revenue operations" and had access to first-hand knowledge on these matters, the Eleventh Circuit found sufficient indicia of reliability to satisfy Rule 9(b). *Mastej*, 591 F. App'x at 708-09. However, the Eleventh Circuit emphasized that the alleged fraud there did not depend on particularized medical or billing content of claim forms, which it deemed a "critical" distinction to the decision. *Id.* at 708. According to the Eleventh Circuit, if a FCA case involving allegations that a Medicare claim has a false statement because it seeks

reimbursement for medical services not rendered, unnecessary, overcharged, miscoded, or not covered by Medicare, then "representative claims with particularized medical and billing content matter more, because the falsity of the claim depends largely on the details contained within the claim form—such as the type of medical services rendered, the billing code or codes used on the claim form, and what amount was charged on the claim form for the medical services." *Id.*

Here, Defendants first argue that the Amended Complaint fails to adequately plead falsity. On this point, I disagree. Falsity is an essential element of a FCA violation. *U.S. ex rel. Schutte v. Supervalue Inc.*, 598 U.S. 739, 747 (2023). The FCA does not define the term "false." "Case law, however, has identified various types of false claims and statements." *Yates v. Pinellas Hematology & Oncology, P.A.*, 21 F.4th 1288, 1299 (11th Cir. 2021) (collecting cases). One common example is a claim that "misrepresents the goods or services provided." *Id.*

Defendants contend that "the Amended Complaint contains only conclusory allegations as to falsity, asserting that claims for medically unnecessary services were false and that a lack of medical necessity for some debridement procedures can be inferred from the number of procedures performed on a particular patient over a period of time." DE 86 at 13. While I agree with the general contention that alleged frequency of debridement procedures performed on patients alone is not enough to establish falsity, Ms. Graves offers more. The core of Ms. Graves' allegations is that Dr. Arumugam improperly "upcoded" debridement procedures and recorded "selective" debridement as "surgical" and that this false recording in medical records "used to prepare claims" led to "significantly increased reimbursement amounts that Medicare and Medicaid paid to HCA and Healogics." DE 83 ¶¶ 33-34. In support of her theory, Ms.

Graves alleges that she "often" worked with Dr. Arumugam and that "frequently through [her] employment, Dr. Arumugam would perform selective debridement on a patient," and that Dr. Arumugam "would routinely upcode his selective debridement charges to surgical." *Id.* ¶¶ 31-32, 35. Ms. Graves further relies on her "review of Medicare claims submission information for Dr. Arumugam" which allegedly shows that all of Dr. Arumugam's 449 claims to Medicare for debridements in the year 2017 applied a surgical debridement code instead of a less expensive selective debridement code even though Ms. Graves witnessed Dr. Arumugam perform selective debridement "far more often." DE 83 ¶¶ 56-57. In my view, these allegations are sufficiently specific to support an inference of false claims and statements that misrepresented services provided, *i.e.,* a doctor's false claims of surgical debridement after actually performing selective debridement.

While I find the falsity element sufficiently pled, Counts 1 through 4 of the Amended Complaint fall short of applicable pleading standards for other reasons.

*First* and foremost, the Amended Complaint fails to plead the actual submission of a false claim. Ms. Graves is a clinical nurse manager with no alleged experience in or first-hand knowledge of Defendants' billing practices or claim submission process.[4] Thus, Ms. Graves' claims fall squarely within the categories of cases where representative claims with

---

[4] I wish to note here that I am not persuaded by Defendants' argument that Ms. Graves is akin to a total "corporate outsider" to the alleged billing entities and individuals. DE 86 at 17 (citing *Clausen*, 290 F.3d at 1314 (holding that a corporate outsider's lack of information about the defendants' billing practices makes it more difficult to gather the factual specifics necessary to meet Rule 9(b)'s requirements); *Mastej*, 591 F. App'x. at 704 (11th Cir. 2014) ("[A] plaintiff-relator without first-hand knowledge of the defendants' billing practices is unlikely to have a sufficient basis for such an allegation")). As an experienced Clinical Nurse Manager who allegedly carried out "management responsibilities" and "often worked directly with doctors" at the Center, DE 83 ¶ 31, it is entirely possible that Ms. Graves has either independent or acquired knowledge of the billing, financial, or claim submission process for medical procedures performed at the Center. Though she has not alleged such knowledge yet, it does not appear outside the realm of possibility that she can do so given her alleged background experience and job responsibilities.

particularized medical and billing content "matter more" because falsity depends on the details within the claim form.  *See Mastej*, 591 F. App'x at 708(describing FCA claims involving services not rendered or for services that are unnecessary, overcharged, or miscoded).  Salient details are noticeably absent here.  Ms. Graves does not allege that she participated in, had any involvement in, or knew who was involved in the submission of a false claim to any government healthcare program.  The Amended Complaint does not include a copy of any bills, payments, or forms pertaining to Medicare or Medicaid submissions.  There is no alleged information about Ms. Graves' knowledge of the claims or billing process generally.  All Mrs. Graves alleges is that she observed Dr. Arumugam "falsely record the procedure in the medical records *used to prepare claims* as a surgical debridement of subcutaneous tissue or muscle" and "bill using CPT Code 11042."  DE 83 ¶ 33 (emphasis added).  Medical records are inherently different from billing records.  *See U.S. ex rel. Aquino v. University of Miami*, 250 F. Supp. 3d 1319, 1330-32 (S.D. Fla. 2017) (patient access and surgical coordinator's knowledge of information entered into medical records before bills were prepared and submitted by other department did not provide indicia of reliability necessary to survive dismissal); *Florida ex rel. Stone v. Nature Coast Emergency Med. Found., Inc*., 2021 WL 3134725, at *4 (M.D. Fla. Mar. 26, 2021) (paramedic who did not work in billing department but allegedly had "inside information" about defendant's practice of providing medically unnecessary services to Medicare and Medicaid beneficiaries did not operate to provide the necessary indicia of reliability).  Ms. Graves fails to describe how Dr. Arumugam's medical record entries were used in the billing process or how such entries translated into false claims being submitted to governmental entities, and her source of any such knowledge.

Ms. Graves argues that she has adequately pled false claims by providing "representative claims" and identifying "the date of service, the date of the claim, the CPT code billed, the amount billed to Medicare by each Defendant, and the amount Medicare paid each Defendant in connection with the claim." DE 92 at 15. It is true that the Amended Complaint refers to four representative patients and includes Plaintiff-created tables with detailed information about dates of service, claims dates, billing codes, amounts billed, and amounts paid. DE 83 ¶¶ 36-40 (Patient A), 41-45 (Patient B), 46-50 (Patient C), 51-55 (Patient D). However, there is no clearly alleged foundation as to how Ms. Graves knows the information contained within these patient tables. While the information itself is specific, Ms. Graves does not indicate where this information derives from and there is no clear explanation or supporting documentary evidence attached to the Amended Complaint. Thus, as pleaded, indicia of reliability is lacking. Sufficient indicia of reliability in this context requires more, such as explanation of Ms. Graves' source of knowledge underlying the data she has provided and her own knowledge—either through direct observation or based on her professional background experience.

In addition, Ms. Graves asserts in conclusory fashion that HCA and Healogics submitted false claims after certain specific dates as to each anonymous patient. *See* DE 83 at ¶ 39 (as to Patient A, alleging that each claim submitted "on or after October 31, 2017 were false claims"), ¶ 44 (as to Patient B, alleging that each claim submitted "on or after October 9, 2017 were false claims"), ¶ 49 (as to Patient C, alleging that each claim submitted "on or after February 6, 2017 were false claims"), ¶ 54 (as to Patient D, alleging that each claim submitted "on or after March 29, 2017 were false claims"). There is no clear foundational explanation as to why or how these specified dates were chosen and how Ms. Graves knows that all procedures after the chosen

date were selective versus surgical.  Without these sorts of salient foundational details, dismissal is warranted.

Lastly, as further support for her claims, Ms. Graves alleges that a "review of Medicare claim submission information for Dr. Arumugam further establishes his fraudulent billing practices."  *See* DE 83 ¶ 57.  She then includes a single paragraph summarily indicating that "CMS claims data for the year 2017" shows that Dr. Arumugam submitted 449 claims to Medicare for debridements that year and that all of his claims applied a surgical debridement code with no claims made for selective debridement even though Ms. Graves witnessed Dr. Arumugam perform the latter service "far more often" in 2017.  *Id.*  Similar to the anonymous patient tables, this information is presented in conclusory fashion with no supporting indicia of reliability.  "CMS" is nowhere clearly defined or explained in the Amended Complaint.[5] Moreover, the Amended Complaint does not include, for example, attached supporting documentation or, at minimum, a clear explanation regarding the source of this 2017 "Medicare claim submission information" for Dr. Arumugam.  In short, Ms. Graves arguably provides "the who, what, where, when, and how of improper practices, but [s]he fail[s] to allege the who, what, where, when, and how of fraudulent submissions to the government" with sufficient indicia of reliability.  *Corsello*, 428 F.3d at 1014.  She fails to meaningfully connect the information she says she observed Dr. Arumugam enter into patient medical records (as depicted on her tables) to the preparation and submission of a false claim to a government program.  *See U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1359 (11th Cir. 2006) (relator

---

[5] The only other reference to "CMS" in the Amended Complaint relates to alleged debridement information. *See* DE 83 ¶ 27.  This other reference includes an internet link to a cms.gov article, which leads the reader to learn that CMS stands for U.S. Centers for Medicare & Medicaid Services.  In this FCA context, Ms. Graves should more clearly define and explain her primary source(s) of information within her pleading.

"cites particular patients, dates and corresponding medical records for services that he contends were not eligible for government reimbursement," but "fails to provide the next link in the FCA liability chain: showing that the defendants *actually submitted* reimbursement claims for the services he describes") (emphasis in original).  While Ms. Graves arguably pleads presentment of false claims with some level of specificity with her reference to anonymous patient tables containing specific data, she has presented the information in a conclusory and unsupported fashion, without identifying the source material or any circumstances that would show these self-created tables are reliable and trustworthy.

*Second*, the Amended Complaint fails to put each corporate Defendant on proper notice of which of them allegedly did what in the fraudulent billing scheme.  For example, Ms. Graves alleges in conclusory fashion that Defendants HCA and Healogics "knowingly presented or caused to be presented false or fraudulent claims for payment or approval to the United States." DE 83 ¶¶ 61, 65.  The Amended Complaint is silent as to the specific role played by newly-added Defendants Sebring and Nautilus in the alleged scheme.  And while Ms. Graves alleges that Dr. Arumugam "knowingly" made false claims and "knowingly" made or used false records, *id.* ¶¶ 69, 73, there is no allegation that Dr. Arumugam knew anything about how corporate Defendants HCA, Healogics, Sebring, or Nautilus reviewed the medical records or submitted claims to government payors or which of these entities was involved in preparing the submissions.

More allegations are needed regarding, for example, which corporate entity, department, or individuals prepared, approved, submitted, or had knowledge of the allegedly false claims to government payors.  Defendants persuasively cite to federal cases in Florida offering examples of the level of particularity that is needed to satisfy Rule 9(b)'s standard in

18

this context.  DE 86 at 15-16 (citing *U.S. ex rel. Crocano v. Trividia Health Inc.,* 615 F. Supp. 3d 1296, 1307 (S.D. Fla. 2022) (dismissing amended complaint for failure to plead claims with particularity, noting that pleading did not provide "the name of any individual or individuals who submitted the claim, or copies of a single bill or payment"); *Hopper*, 588 F.3d at 1326 ("[W]e are unable to discern from the complaint a specific person or entity that is alleged to have presented a claim"); *U.S. ex rel. Jacobs v. JP Morgan Chase Bank, N.A.*, 2022 WL 573663, at *4 (S.D. Fla. Feb. 25, 2022) ("[T]he loan samples in Exhibits 2 and 3 detail who the borrower is but do not identify which individual from [the bank] submitted the claims to Fannie or Freddie")).

Simply put, Ms. Graves has not sufficiently pled "details of . . . [D]efendants' allegedly fraudulent acts, when they occurred, and who engaged in them" sufficient to satisfy Rule 9(b). *See Clausen*, 290 F.3d at 1310.  Her present allegations cannot survive dismissal.  More is needed, such as who generally from HCA, Healogics, Sebring, or Nautilus had knowledge of or was part of the alleged fraudulent scheme resulting in the submission of false claims to government payors such that FCA liability could attach.  *See U.S. v. Norman*, 2018 WL 264253, at *1 (M.D. Fla. Jan. 2, 2018) (Rule 9(b)'s particularity requirement requires a relator to "describe with particularity each defendant's participation in the alleged fraud.").

For the above stated reasons, Counts 1 through 4 of the Amended Complaint lack Rule 9(b) particularity in key respects. While Ms. Graves alleges her knowledge of various improper coding practices by Dr. Arumugam purportedly leading to fraudulent billing, she does not sufficiently allege the basis for her knowledge regarding fraudulent submissions to the government.  This sort of "specific detail" about false claims is required to establish the indicia of reliability necessary under Rule 9(b).

**B.      Counts 5-8:  F/FCA Claims**

Counts 5 through 8 are brought under the F/FCA.  The F/FCA in Florida is modeled after its federal counterpart and "the standards under both the Florida Act and the Federal Act are the same."  *U.S. ex rel. Heater v. Holy Cross Hosp., Inc.*, 510 F. Supp. 2d 1027, 1036 (S.D. Fla. 2007); *see also U.S. Space Coast Medical Assocs.*, 94 F. Supp. 3d 1250, 1252 n.4 (M.D. Fla. 2015) ("The Florida False Claims Act mirrors the federal False Claims Act and is subject to the same pleading standard.").  Still, even under the mirrored structure, a complaint must allege facts implicating false claims submitted to the State of Florida, not just the United States. *See U.S. v. Norman*, 2018 WL 264253, at *3 (M.D. Fla. Jan. 2, 2018) (dismissing a complaint which "[said] nothing about a claim submitted to, or paid by, the State of Florida").

For the same reasons that Mrs. Graves fails to state valid claims under the FCA, she also fails to plead valid claims under the F/FCA.  Additionally, the Amended Complaint is lacking in state-specific allegations.  For instance, as Defendants' point out, the Amended Complaint is silent on how Florida government programs handle debridements—from a coverage, coding, or billing perspective—and says nothing about a claim submitted to, or paid by, the State of Florida.  Dismissal of these state counterpart claims is thus required.

**C.      Count 9:  Retaliatory Discharge Under the FCA**

Finally, in Count 9, Mrs. Graves alleges that Defendant HCA constructively terminated her employment in retaliation for her attempts to stop Defendants from submitting false claims. The FCA creates a private right of action for an individual whose employer retaliates against her for participating in a FCA action or in response to other efforts the employee engages in to oppose a violation of the FCA.  31 U.S.C. § 3730(h)(1); *Hickman v. Spirit of Athens, Ala., Inc.*, 985 F.3d 1284, 1287-88 (11th Cir. 2021) (discussing the evolution of the FCA and its retaliation

provision). Specifically, the FCA's anti-retaliation provision protects employees, like Mrs. Graves, from being targeted for: (1) "lawful acts done ... in furtherance of an action under [the FCA]" or (2) "other efforts to stop 1 or more violations of this subchapter." 31 U.S.C. § 3730(h)(1). To plead a FCA retaliation claim, Mrs. Graves must allege that "(1) she engaged in statutorily protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities." *Simon ex rel. Fla. Rehab. Assocs., PLLC v. Healthsouth of Sarasota Ltd. P'ship*, 2022 WL 3910607, at *5 (11th Cir. Aug. 31, 2022); *see also U.S. v. HPC Healthcare, Inc.*, 723 Fed. App'x 783, 791 (11th Cir. 2018).

Here, Ms. Graves claims she lawfully acted to prevent Defendants from violating the FCA by verbally telling "Dr. Arumugam that she believed he was improperly upcoding selective debridements as surgical debridements resulting in false claims" and reporting the "upcoding issues to Ms. Marsha Jamison, HCA's Chief Nursing Officer at Highlands Regional." DE 83 ¶ 93. According to Mrs. Graves, HCA knew about her false claim complaints and retaliated against her by "constructively terminating her employment by failing to stop the illegal practices" and "terminating her employment after she resigned in retaliation for trying to stop HCA's violations of the [FCA]. *Id.* ¶ 94.

General and conclusory allegations of fraud reports are not enough in this context. *Hickman*, 985 F.3d at 1289 ("It is not enough for an employee to suspect fraud; it is not even enough to suspect misuse of federal funds. In order to file under the [FCA], whether in a *qui tam* or a retaliation action, an employee must suspect that her employer has made a false claim *to the federal government*.") (emphasis added). Here, accepting her allegations as true, Ms. Graves made verbal complaints to a doctor and her supervisor about "upcoding issues" relating to wound care services leading to false claims. While Mrs. Graves alleges verbal reports of

general wrongdoing pertaining to a doctor's coding practices, she does not specifically or clearly allege that she led either Dr. Arumugam or her supervisor to believe that Dr. Arumugam's actions somehow constituted the submission of false claims to the government or that Dr. Arumugam or any other affiliated Defendant might be sued in a *qui tam* action.  Thus, the nature of Ms. Graves' complaints, as currently pled, do not support a reasonable inference that Defendant HCA was on notice that they could be reported to the government for fraud or sued in a *qui tam* action, which is fatal to her retaliation claim.  *See U.S. ex rel. Sanchez v. Lymphatx, Inc.*, 596 F.3d 1300, 1304 (11th Cir. 2010) (to state a claim for retaliatory discharge under the FCA, the employee's actions must be "sufficient to support a reasonable conclusion that the employer could have feared being reported to the government for fraud or sued in a *qui tam* action by the employee").  I therefore recommend that Count 9 for retaliation under the FCA be dismissed.

**D.      Dismissal Should Be *Without* Prejudice**

Defendants move to dismiss the Amended Complaint with prejudice arguing that further "amendment would be futile because Relator, who has no connection to any of the Defendants' billing departments, will never be able to satisfy *Clausen's* stringent requirements."  DE 86 at 27.  Ms. Graves counters that any deficiencies in her pleading could be remedied.  For example, Ms. Graves "could provide (1) additional examples of false debridement claims; and (2) additional detail related to the claims already provided (*i.e.* diagnosis codes and diagnosis descriptions)."  DE 92 at 23.  Ms. Graves also offers to further distinguish the role of each corporate entity and to "assert additional details about the complaints that she lodged regarding Dr. Arumugam's fraudulent practices, how those complaints impacted her working conditions,

and the timing of those complaints and her termination" in further support of her retaliation claim." *Id.*

In my view, the Amended Complaint is further along than the original complaint, however pleading deficiencies remain. Even so, further amendment does not appear futile. Given the data, information, and background experience that Ms. Graves has alleged thus far, it is possible that she may be able to nudge her FCA and related claims across the Rule 9(b) pleading threshold if given the opportunity to amend. Indeed, she has offered specific examples of how she would aim to accomplish this goal. Because Ms. Graves has amended only once before, Rule 15(a)'s liberal standard for amendment of pleadings is warranted here and I thus recommend that Ms. Graves be given one final opportunity to amend her complaint.

## CONCLUSION

The Amended Complaint fails to state viable claims under the FCA or its Florida counterpart under applicable pleading standards. Ms. Graves paints part of a story about alleged fraudulent billing practices where she worked, but her story is missing salient details that are necessary to sustain a cause of action under the FCA—perhaps the most important being information to connect the dots between data she allegedly observed Dr. Arumugam enter into patient medical records and the preparation and submission of allegedly false claims to government payors. Ms. Graves should be given one final opportunity to cure her pleading.

Thus, I respectfully **RECOMMEND** that Defendant's Motion to Dismiss, DE 86, be **GRANTED IN PART AND DENIED IN PART**. The Amended Complaint should be **DISMISSED** in its entirety **WITHOUT PREJUDICE** and Mrs. Graves should be afforded one final opportunity to amend her complaint.

## **NOTICE OF RIGHT TO OBJECT**

The parties shall have fourteen (14) days from the date of being served with a copy of this Report and Recommendation within which to file written objections, if any, with U.S. District Judge Robin L. Rosenberg.  Failure to file objections timely shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and Recommendation and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 149 (1985); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).  **Conversely, if a party does not intend to object to this Report and Recommendation, then that party shall file a Notice of such within five (5) days of the date of this Report and Recommendation.**

**DONE AND RECOMMENDED** in Chambers at Fort Pierce, Florida, this 8th day of November, 2023.

SHANIEK MILLS MAYNARD
U.S. MAGISTRATE JUDGE